1998 ND 102

**The STATE of North Dakota,
Plaintiff and Appellee,**

v.

**Danielle GREYBULL, a/k/a Danielle
Lyons, a/k/a Danielle Harlan,
Defendant and Appellant.**

**Criminal No. 970216.**

Supreme Court of North Dakota.

May 20, 1998.

Rick L. Volk (argued), Assistant State's Attorney, Bismarck, for plaintiff and appellee.

Wayne D. Goter (argued), Bismarck, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] A jury found Danielle Greybull guilty of manslaughter for the stabbing death of Charlene Yellow Bear. Danielle appealed her conviction and the trial court's finding that she was a special dangerous offender for sentencing. We affirm the conviction and the sentence.

[¶ 2] Between 8 and 9 p.m. on April 13, 1996, the occupants of a Bismarck apartment belonging to Michelle C'Hair discovered Charlene was not sleeping on the couch as they had believed, but was dead. An autopsy confirmed Charlene had died from a stab wound in her chest, and identified the time of her death at near 6:15 p.m.

[¶ 3] On the day of the stabbing, Danielle's three children were at the C'Hair apartment with their father, Harold Harlan, Danielle's ex-husband. The children told police Danielle had phoned them earlier and then came to the C'Hair apartment between 5:30 and 6:00 p.m. Danielle said she had gone there with her friend Dana Reidhammer to get her children, who had told her they had not been

fed that day. When Dana and Danielle arrived at the front door, the children ran out the back, refusing to go with Danielle. Danielle followed the children through the apartment to the back door in the kitchen.

[¶ 4] As they ran out, the children saw Charlene sleeping at the kitchen table. When the children returned to the apartment minutes later, they saw Charlene sitting on the couch in the living room. Later, the children reported Danielle had taken the kitchen telephone with her as she left the apartment.

[¶ 5] When Michelle C'Hair returned home from work at 7:40 p.m., the children were upstairs, where their father and other adults had been sleeping throughout the day. Michelle's son told her Danielle had been at the apartment and had stolen their phone. In her apartment, Michelle saw Charlene sitting on the living room couch "kind of straight up slumped over to the left," her eyes closed and head down. Soon, the children told Michelle of Danielle's visit, and a neighbor came over and told Michelle the tires on Harold's car were flat. When she went outside to look, Michelle saw the tires had been slashed.

[¶ 6] Michelle returned inside and saw Charlene had not moved on the couch. Shortly, one of the children told Michelle that Charlene's lips were blue. Michelle checked on Charlene and discovered she was dead. After calling 911, Harold and Kay Yellow Bear moved Charlene to the floor, seeing for the first time blood and a stab wound near her chest. The police came to investigate.

[¶ 7] At 11:30 that evening, Bismarck police officers located Danielle at Dana Reidhammer's home, where she was living with her husband, Arthur Greybull. The officers told Danielle she was not under arrest, but asked her to go to the police station with them for questioning. She agreed.

[¶ 8] Nearly 12 minutes into the videotaped questioning at the police station, Danielle was read the *Miranda* rights, and she said she understood them. She was then questioned for nearly 75 minutes. Danielle denied a detective's accusation that she had stabbed Charlene, saying: "I didn't see her. I didn't do nothing to the bitch. I don't even

know her." The detective repeated the accusation, and Danielle replied: "You can't make me say nothing. I didn't do nothing. I didn't do nothing to her. I didn't do a ... thing to the bitch. I didn't even know her."

[¶ 9] Another detective joined the questioning, and Danielle told him Charlene had come at her, but would not elaborate. During the exchange with the second detective, Danielle asked, "Do I have to get a lawyer? Do I need to get a lawyer...." The detective replied, "that's up to you." The questioning resumed without further attention to Danielle's inquiry. Eventually, Danielle confessed to stabbing Charlene, but claimed she did so in self-defense.

[¶ 10] On April 15, 1996, Danielle was charged under NDCC 12.1–16–02 with a class B felony of manslaughter. During her arraignment on June 24, 1996, Danielle was informed of the maximum and minimum sentences, ten years and four years, for a class B felony. In mid-March 1997, the State served and filed a request under NDCC 12.1–32–09(1)(e) for Danielle to be sentenced, if convicted, as a special dangerous offender for having used a dangerous weapon, a knife, in committing the offense under NDCC 12.1–32–09(2)(b). The effect of the designation as a special dangerous offender was to increase Danielle's potential maximum sentence to 20 years, if convicted.

[¶ 11] Danielle pled not guilty to manslaughter, and moved to suppress "all statements made to law enforcement officials at and after the time" she was questioned at the police station on grounds the police violated her "right to remain silent and the right to have an attorney during questioning." Her motion was denied, and a jury trial was held. On April 16, 1997, the jury convicted Danielle of manslaughter.

[¶ 12] After a presentence investigation, the trial court found Danielle to be a dangerous special offender and sentenced her to the maximum of 20 years in prison. Under NDCC 12.1–32–09.1, Danielle must serve at least eighty-five percent of this sentence before she will be "eligible for release from confinement on any basis."

[¶ 13] Danielle appealed.

## I.  Suppression Denial

[¶ 14] We explained our standard of reviewing an order denying or granting suppression of evidence in *State v. Sabinash*, 1998 ND 32, ¶ 8, 574 N.W.2d 827:

> We enunciated our standard of review of a court's disposition of a suppression motion in *State v. Bjornson*, 531 N.W.2d 315, 317 (N.D.1995):
>
> > The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. *State v. Zimmerman*, 529 N.W.2d 171 (N.D. 1995); *City of Fargo v. Thompson*, 520 N.W.2d 578 (N.D.1994). That standard of review recognizes the importance of the trial court's opportunity to observe the witnesses and assess their credibility, and we "accord great deference to its decision in suppression matters." *State v. Brown*, 509 N.W.2d 69, 71 (N.D.1993).

We conclude the evidence here supported the trial court's denial of Danielle's motion to suppress.

[¶ 15] Danielle argues the trial court erred in denying suppression of her statements to the police.  Danielle concedes she understood and waived the *Miranda* rights read to her before her questioning at the police station.  *See Miranda v. Arizona*, 384 U.S. 436, 473–74, 474, n. 44, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  If an individual indicates his desire to remain silent, but has an attorney present, there may be some circumstances in which further questioning would be permissible."  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").  Danielle claims she "invoked her right to remain silent and her right to counsel" during the questioning, but the officers persisted with the interrogation.  She argues the continuation of questioning violated her rights, and her statements after "invok[ing] her rights" should have been suppressed.

[¶ 16] The State argues Danielle's repeated comments during interrogation ("You can't make me say nothing."  "Do I need to get a lawyer?") were not assertions to remain silent or requests for counsel.  Rather, the State contends Danielle's comments were ambiguous and did not satisfy the "clear articulation rule" set out in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).  In *Davis* at 459, 114 S.Ct. 2350 (quotation omitted), the United States Supreme Court held an effective request for counsel during interrogation must be unambiguous: "Although a suspect need not 'speak with the discrimination of an Oxford don,' . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."

[¶ 17] The "clear articulation rule" of *Davis* has also been applied to requests to remain silent.  *State v. Ross*, 203 Wis.2d 66, 552 N.W.2d 428, 429–30 (Wis.App.1996)("We hold that the United States Supreme Court decision in *Davis v. United States* . . . which held that a criminal suspect must unambiguously request counsel before the police must cease questioning, also applies to a suspect's invocation of the right to remain silent.").  *See also United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995)(Statements " 'I don't need to make any statement.  I don't need to say anything.' . . . fall far short of a clear or unequivocal expression of the right to remain silent.");  *Diaz v. Senkowski*, 76 F.3d 61, 63, n. 1 (2nd Cir.1996) (Statements " 'I think I want a lawyer . . . Do you think I need a lawyer?' " were not unambiguous assertions of the defendant's right to counsel.).

[¶ 18] We agree with the trial court that Danielle did not unequivocally invoke her constitutional rights to counsel or to silence.  Danielle's inquiry about an attorney was, at best, ambiguous.  It could have been seeking advice from the officers, rather than a request for counsel.  Similarly, her comments about not saying anything were equally unclear, especially since she continued to respond to the officers' questions.  Considering

all of Danielle's comments and their context, we are not convinced she made an unambiguous invocation of her rights. Therefore, the officers did not need to cease questioning, and they responded appropriately when they told her, "that's up to you." The trial court did not err in denying Danielle's motion to suppress her statements during interrogation.

[¶ 19] Danielle's counsel urges us to go beyond the rule in *Davis,* and follow *State v. Hoey,* 77 Hawai'i 17, 881 P.2d 504, 523 (1994), imposing a duty on officers to cease questioning and clarify any ambiguous requests. If Danielle's requests were ambiguous, her counsel argues, the officers should have stopped and clarified by asking, "Are you requesting an attorney?"

[¶ 20] However, *Hoey's* sidestepping of the *Davis* "clear articulation rule" stemmed from the Hawaii Supreme Court's interpretation of its own state constitution. The Hawaiian court explained, by adopting a "stop and clarify" rule, "we choose to afford our citizens broader protection under article I, section 10 of the Hawai'i Constitution than that recognized by the *Davis* majority under the United States Constitution." *Hoey,* 881 P.2d at 523. Here, Danielle's trial counsel did not rely on our state constitution.[1]

[¶ 21] At oral argument, Danielle's counsel on appeal was unable to cite, nor have we been able to find, an alternative to the *Davis* rule that did not rely on a particular state's constitution. Because the North Dakota Constitution was not raised below, *see e.g., State v. Woehlhoff,* 473 N.W.2d 446, 448–49 (N.D.1991), we do not consider whether it accords a suspect greater rights than those recognized in *Davis* during police interrogation.

## II. Evidence Sufficiency

■ [¶ 22] Danielle seeks reversal of her conviction for lack of sufficient evidence to prove she did not act in self-defense. She argues the State did not prove "each and every element" of manslaughter, particularly the "nonexistence of the defense of self-de-

fense." *See* NDCC 12.1–01–03(1)(e). We disagree.

[¶ 23] On appeal, our review of the sufficiency of the evidence for a jury verdict is very limited. *State v. Esparza,* 1998 ND 13, ¶ 17, 575 N.W.2d 203. We explained there (quotations omitted): " 'We will not reverse a criminal conviction unless, after viewing all reasonable inferences favorable to the prosecution, no rational fact finder could have found the defendant guilty beyond a reasonable doubt.' " *Id.* "[A] convict challenging evidence must show the evidence, 'when viewed in the light most favorable to the verdict, reveals no reasonable inference of guilt.' " *Id.*

[¶ 24] Danielle insisted at trial she acted in self-defense after Charlene had attacked her. She argues her account of the stabbing is consistent with the single stab wound to Charlene. Danielle asserts her testimony conflicts with the State's evidence and therefore, she argues, the State did not offer sufficient evidence to prove she did not act in self-defense.

[¶ 25] But Danielle's argument ignores much of the testimony at trial that contradicted Danielle's claim she had acted in self-defense. While Danielle claimed she was in danger of imminent bodily injury and had not provoked Charlene, *see* NDCC 12.1–05–03, her own testimony showed otherwise. Danielle agreed she had entered the apartment uninvited and without knocking. Danielle admitted Charlene was very drunk and weak. Danielle admitted she went after Charlene when Charlene called her a name. Also, there was evidence Danielle could have avoided using deadly force against Charlene, *see* NDCC 12.1–05–07(2)(b), by retreating from a very intoxicated person.

[¶ 26] The court properly instructed the jury that the State had the burden to prove beyond a reasonable doubt Danielle "was not acting in self defense." *Compare State v. Olander,* 1998 ND 50, ¶ 22, 575 N.W.2d 658 (Trial court's failure to instruct the jury "that the State must prove beyond a reasonable doubt the accused did not act in self-defense as an element of the offense . . . was obvious

---

1. Danielle's counsel on appeal is not the one who     represented her in the trial court.

error."); *see also State v. McIntyre,* 488 N.W.2d 612, 614 (N.D.1992). Viewing the evidence in the light most favorable to the verdict, we conclude the jury reasonably found Danielle had not acted in self-defense.

[¶ 27] Therefore, we affirm the jury's verdict.

*III. Sentence*

[¶ 28] In her brief, Danielle argued she was entitled to a new trial because the trial court failed to inform her about the consequences of her designation as a special dangerous offender that allowed her to be sentenced to the maximum of twenty years. As NDCC 12.1–32–09.1 directs, she must now serve at least eighty-five percent of that maximum sentence imposed by the court. At oral argument, however, her counsel conceded *State v. Magnuson,* 1997 ND 228, 571 N.W.2d 642, controlled so he did not argue this issue.

[¶ 29] In *Magnuson* at ¶ 21, we held the trial court was not required to advise a defendant charged with murder about when the defendant would become eligible for parole under NDCC 12.1–32–09.1. Because the trial court was not required to specifically notify Danielle she would have to serve eighty-five percent of any sentence imposed, she is not entitled to relief from her sentence. We therefore affirm it.

[¶ 30] We affirm Danielle's judgment of conviction and her increased sentence as a special dangerous offender.

[¶ 31] VANDE WALLE, C.J., and MARING and NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring specially.

[¶ 32] Referring to the defendant, the victim, and others by their first names is, in my view, inappropriate. With that exception, I agree with the majority opinion.

[¶ 33] Dale V. Sandstrom